Good morning. I'd like to reserve a couple minutes of rebuttal time. My name is John Lambrose. I'm here on behalf of Mr. Dearing, and I'd like to begin by speaking to the preclusion of the theory of defense evidence. Obviously, this is another AEDPA case, and we're viewing the proceedings below through the deferential prism. The last reason decision in this case, as I put in the briefing, was the trial court's decision, Judge Leavitt's decision to preclude the testimony of the two child witnesses on two evidentiary grounds, both of them very general, nothing very specific. The first one was that the evidence would be cumulative, and that decision is found at the excerpts at pages 37 through 47. And then the other reasoning, or the other reason that Judge Leavitt provided was somewhat not related. He said not only was it cumulative, but it was irrelevant. And if we begin by which clearly established Supreme Court cases control, again, as I pointed out in the briefing, they start with Washington v. Texas and Chambers v. Mississippi through Taylor v. Illinois. In those cases, if you can synthesize any kind of general rule, stand for the proposition that the due process clause, with the compulsory process clause of the Sixth Amendment, allow a criminal defendant to present any credible evidence that goes to a material issue that is relevant to his or her theory of defense. What you're telling us basically is that your theory of defense was impaired because two was impaired. The theory of defense was, and it went to a specific trial issue that the prosecutor presented to the jury in his 30th and 31st witnesses, and that was that a witness that did not testify, Mr. Hirsch, colluded with various people, either with those folks' permission and complete compliance, or under duress, as with the children, to present perjurious testimony against Mr. Deering at his trial. So Hirsch is the source of all bad evidence against the defendant. Hirsch is the source of the bartender's having heard the alleged confession. Well, how do we know that? Well, through... He denies it. No, she does not deny it. She testifies that she... What do you mean by source? What do you mean by source then? Well, he catalyzes her. He takes her by laying out false evidence of child molestation and murders that Mr. Deering committed that were completely untrue, and the state's witness, the detective, the investigating detective, Mr. Dillard, the 31st witness, the summary witness, if you will, even said that. He said, I smell a rat. I think these two people may be colluding, Hirsch and Mathis. So that's why I wanted Hirsch present when I interviewed Mathis. So he has Hirsch present, he interviews Mathis, and then he concludes, and why would he not? I mean, he's the homicide detective that has to put this case together for the prosecutor. He concludes that Mathis is just fine. Well, that's okay, but that should not be irrebuttably presumed that Mathis's testimony is credible and that it's not contrived. And all trial counsel was trying to do, repeatedly, and, you know, and it doesn't usually happen in these kinds of cases, but making a stellar record with regard to the fact that this evidence went to a material trial issue. It wasn't cumulative. It wasn't collateral. It wasn't extrinsic. And that trial issue was the credibility of the quote-unquote confession that the bartender had testified to and other witnesses had heard her say that when she first heard it in whether we don't know if it was 83 or 84 or 85, but in some three-year span of time, she heard this and just decided it was bar talk, her words, something that didn't matter to her. What I was looking for was some connection between Hirsch and this bartender. He had told her or something like that, and I couldn't find any exact connection. She just sort of said it was generally known in the community. It was floating around in the air, and so as a bartender, I just sort of hit him between the eyes with it. And to my surprise, he confessed. He did not say, you know, Hirsch came around and fed me this information and said, watch to see if you can loosen this guy up with a couple of beers and get him to confess. That's the kind of connection I was looking for, or something like that. She denies it. Exactly. And with all due respect, Judge Trott, if we'd have had that kind of connection, we wouldn't be worried about whether or not we could have proffered the children's testimony. What we were, what trial counsel was saying was, a very reasonable inference can be drawn from the fact that these children would say that they were forced to lie about child molestation. Now what the connection there was, the reason that that evidence was not cumulative. Yeah, I want to, that was going to be my next question, because this factor was already in the case. Right. But it was more amorphous than that. The factor was in the case through the two Wichita cops, the one detective that said, you know, we investigated that molestation stuff and it was baloney. But he didn't say it was baloney because of Hirsch's forcing his own children to lie. He did not say that. The homicide police officer said, yeah, you know, we investigated this, this Hirsch and Sekirka guy. They'd been impersonating cops. They'd been going around town trying to put Deering in a switch bag for the, for these kids. And they were lying. Hirsch was contriving this in order to put Deering in jeopardy for a 10-year-old Nevada homicide. And that's what the children would have been able to do. The children would have shown that link. And defense counsel would have then been able to argue to the jury, here's the link. Here's what motivated Janet Mathis to lie. What motivated Hirsch to lie was she was told that, falsely, that Deering, a guy that she didn't like because he had already cheated some friends of hers on a construction deal where he was the contractor of their home. And needless to say, that could inspire a lot of antipathy in somebody. He, she thought that he was a jerk from day one. Couldn't stand him. So really, I mean, if she had any propensity to decide that this Bartok was in, you know, was in fact really happened, then that propensity was inspired by the fact that she would be able to put away a child molester and a serial murderer linked to, by Hirsch's statements, seven strangulations in the Wichita area. Now, again, let's fast forward to Detective Dillard's testimony. On redirect by the district attorney, Detective Dillard, and I don't know, maybe he let it slip because I know Detective Dillard and he's usually a little smoother than this, but he did let it slip that he thought that there was a chance that Hirsch and Mathis could have been colluding. Now, that comes right from the state's testimony. So, and it was not until after Dillard testified and after defense counsel set the ground, laid the groundwork for the children's testimony through the two, through the two Wichita police officers who did not have direct evidence that Hirsch was a liar and that he would go to any means to jeopardize Deering's life and or liberty. But the children could do that. And that's when the first proffer was made. And the proffer was very limited. The first proffer was, all I want to do is call these two children to testify that their father, who had subsequently been convicted for taking them to Canada against a custody order, their father told them, you better go in there and you better tell these police officers that your Uncle Chuck molested you and put a gun to your mouth and was going to pull the trigger unless you told, and that was the story. And if you don't do that, I'm going to kill your mother, I'm going to kill your grandmother, and I'm going to hurt you two guys. This guy is a real wonderful father. And the children were waiting out in the hallway in the courtroom with their mother prepared to testify and Judge Leavitt found that evidence to be irrelevant and cumulative. And at the end of the day, what it was, if you look at this case from the historical perspective, until the bartender's, quote, unquote, confession, the confession to the bartender comes to light in 1988 via Hirsch, Mr. Deering was living a free man in Kansas. He had originally been arrested in 82, but released because, as the prosecutor repeatedly said in closing argument, until they had the confession, it was a circumstantial case. Until we had the confession. He just kept hitting on the confession. What did they have besides the confession? To the bartender. They didn't have anything. They had, and this gets to my second issue, the Miranda issue, they had statements that Mr. Deering made to the police officers that were not, admittedly, and I concede this point, they were not overtly inculpatory. But there was like this drip, drip, drip of stuff that just didn't add up. And the prosecutor used that at length during closing argument. The fact that he'd been gone 15 minutes, the phone in the master bedroom didn't work, you know, she didn't have any life insurance policies on her. Those statements all came in against him. Was there the usual kind of evidence that you get in these kinds of cases? No evidence of forcible break-in, no evidence of robbery, all those kinds of things? Right. And the amount of time, this was not CSI Las Vegas, the amount of time spent at that crime scene was about 30 minutes. They had their guy. They knew who they were going to arrest. They knew who they were going to take downtown. And the only reason it took four hours is they were waiting for the medical examiner to phone in the fact that she had been strangled. Because they were all sitting around going, well, we don't know how she's died. We don't know how she's died. And that comes out. Again, Detective Diller, in a more candid moment, says, you betcha, he was the suspect from day one. Sure. I mean, that's statistically, it's always relatives. Well, sure. And I think that that cuts my way with regard to, you know, for segwaying into the case. Except he's the one who called the police and he was not, he had not been arrested. No, he had not been arrested. But he certainly, you know, if we look at this again through the EDPA lens and what are the cases that controlled California v. Baylor and the Stansbury case, the facts are what they are. And I don't dispute that. So we have that. But would a man in his position feel like he was free to leave or if he was under arrest? The police never said he was under arrest. But, you know, every one of the police officers, beginning with the first officers there, said, I wasn't going to let this guy go to the neighbor's house to make a phone call without me chaperoning him. Either he's the innocent victim of somebody who just killed his wife and he calls the police. And so, I mean, obviously, you want to let him talk. I mean, he's the one who called the police. Or he did kill his wife and he's trying to fake his way through the whole thing. Well, and that certainly was the state's theory. But, you know, I mean, in either event, how does Miranda kick in? Well, Miranda kicks in if I can show to you today that he was in custody at the time that the first officer got there and heard his story. Did he agree to go to the police station? Well, you know, he didn't. He didn't. He didn't say I'm not going. That would have been nice if they order him to go to the police station. They said, we want you to go downtown and give us a formal statement. And then the formal statement took 30 minutes. He was handcuffed. Afterwards. He signed it. You know, is there a difference between the fact? It's unclear from the record as to whether or not he had to take his handcuffs. They had to take his handcuffs off for him to sign it. But they had to wait. Now, here's where the contrivance comes in. He signed it after he gave the statement before he was arrested, but he signed it afterwards. Is that right? I think. No, no, I think he saw it. I think the way it goes down is he's he gives the statement. It only takes maybe twenty five minutes. It's transcribed. It takes then three hours to be transcribed, which is suspicious because I think the reason it took three hours is they were waiting for the phone call from Sheldon Green. Tried to transcribe the statement. Pardon me. Ever tried to transcribe. It doesn't take three hours. This statement didn't take three hours. The ones that take ten minutes are ripped to pieces by defense attorneys. Well, let's just assume for the sake of discussion that it took an hour. That's still that's still me. Let's take it. It took three about three hours or whatever to try to transcribe it for whatever reason. Well, if it did, he's not under arrest at that point. He's handcuffed and he's sitting in a room. When was he handcuffed? Just after he made the statement? I think he was handcuffed. And again, this is really unclear from the record. But my take on it is that he was handcuffed shortly after he gave the statement. And well, after the statement. Yes. But before the transcript, before he signed it, I think I think they had any difference for Miranda purposes. Well, I think what makes the difference here is the most reasonable inference that I draw. And I would implore the court to take a look at this inference is that the the only reason that they waited three hours to tell him he was under arrest is they needed a cause of death. Right. But he's already given the statement. I mean, Miranda, you're trying to suppress the statement, not the signature. I agree. I agree. But but in order for the in order for the statement to be in violation of Miranda, I have to be able to show that he was in custody at a point in time. Objective point of view. Yes. From from his objective point of view. All right. So he goes down to the station, he gives a statement. And then, of course, when he when when they put the cuffs on him, no question about that. But that's after the statement. So what happens before that? That would indicate to an objectively objective person and issues that he was in custody. It was he was chaperoned the entire time from the time of the arrival of the first officer until he got in the squad car to go downtown. And that was only 40 minutes. But there he was never he couldn't even go across the street to the neighbor's house to call his mother without a police officer following him. And the police officer, I think I've used I don't want to use my rebuttal time, but to finish my thought, the if I can remember it, the police officer's statement was that he was not going to let him out of his sight. OK, we'll give you a couple of minutes. OK, thank you very much. We'll hear from the state. May it please the court and counsel, my name is Robert Whelan. I'm a senior deputy attorney general employed by the Office of the Attorney General of the State of Nevada. I have the privilege and honor of representing the respondents in this action. Mr. Lambrose has talked predominantly about the error made by the error purportedly made by the court and the failure to allow the children to testify. The problem that Mr. Lambrose has admitted and is existent in this particular case is that there simply isn't any connection between the purported what would purportedly be the children's testimony and the testimony of the bartender, Ms. Lawrence. What he's asking this court to do is draw an inference based on the supposition that because Mr. Hirsch put the children up to testify falsely about a child molestation, that he did the same thing to the barmaid. And even if it were true, even if it were true that Mr. Hirsch put the children up to testify falsely, there is no logical connection or nexus that he necessarily did that to the barmaid. Well, necessarily. How did the barmaid hear about this? My understanding is it seems to have been kind of general knowledge in Wichita because Mr. Hirsch, or excuse me, Mr. Dearing had previously been a police officer in Wichita and his deceased wife, the murder victim, Millie Criswell, had also lived in Wichita. And so based on everything that I've read in the transcript, is it a fair inference that Hirsch is the guy that was spreading all this, whatever you want to call it, information gossip rumor? Okay. Even if Hirsch was, did he like Mr. Dearing? No, he did not. There's plenty of evidence that Mr. Pratt, sure he did. And the thing is, is that, and here's what defense counsel is trying to do, they're trying to put up all this mud to splash all over Mr. Hirsch without calling Mr. Hirsch. Because if you can just imagine this, if defense calls Mr. Hirsch, Mr. Hirsch, please take the stand. Is it or is it not true that you put your children up to making, assuming he would even admit to that? Isn't it true that you did this, that, or the other thing, assuming he would admit to that? Then the prosecutor gets to come in and say, Mr. Dearing, or excuse me, Mr. Hirsch, you hate Mr. Dearing, don't you? Yes. Why don't you tell us exactly why you hate Mr. Dearing? And then Mr. Hirsch gets to say, maybe he gets to say, well, the door's been opened. It was opened several times in this case. It closed real fast. And this, this judge closed doors real fast when you started getting into other stuff. Well, my, my point is, is that what they're trying to do is they're trying to throw mud all over Mr. Hirsch and they don't have any nexus with respect to the testimony that's offered by Ms. Lawrence. It does not follow that even if it were true that Mr. Hirsch, or excuse me, Mr. Hirsch put the kids up to falsify testimony against Mr. Dearing, that he did the same thing. They're separate and distinct instances, not the least of which are the factual distinctions where you've got children that he apparently has some control over and a, a barmaid who just happens to be there. In light of your argument, how do you defend the trial court's conclusion that the testimony was cumulative? Well, first of all, you had the testimony of Mr. Pratt. And it was different. I beg your pardon, Your Honor? The testimony offered by the children was different from anything that was heard at trial, right? No, not really, because you already had the testimony from the detective who said that there'd been this allegation of molestation and they'd found that, uh, there wasn't enough evidence to proceed on it. You also have the testimony of Mr. Pratt, who testified that, uh, Mr. Hirsch had offered to kill him, or Mr. Hirsch had proposed that Mr. Pratt killed Mr. Dearing. So there was plenty of evidence already that Mr. Hirsch hated, uh, Mr. Dearing. Right, but there was no evidence of the specific episode the children were going to testify about, right? There were the allegations. There, the detective testified about the allegations of the child molestation. And he said, uh, I'm talking about the testimony that basically he forced them to lie or wanted them to lie was putting up these stories. I mean, that's, that was the defense thing because they, the defense had to, had to, uh, somehow discredit the, uh, bartender's testimony or, or the case was lost, right? Well, not necessarily, but the point is, is that the children, he's not on trial for child molestation. He's on trial for murder. What is the children's, you know, that has not one thing to do. You know what he's trying to do. You've, you've outlined it pretty well. They're trying, they're trying to show that Hirsch was responsible for everything and, uh, involved in this. Uh, and the point is you may have an argument on relevance. You may have an argument on nexus, but I don't see how their, their testimony is particularly cumulative. It was different. You just argued it was different. No, the testimony about the false child allegations was already there. It was presented by detective Patton. The fact that the children may or may not have come up to testify, yeah, Mr. Hirsch put us up to this, assuming that they would testify to that. Uh, so now that was in, now, now if you're saying it was in the case, then why wasn't it relevant to complete it once the door had been opened on all of this? The issue has to relate to the bias or the credibility of Lawrence. It doesn't have to do thing one with Mr. Hirsch, who never testified, doesn't have thing one to do with the children. If Mr. Hirsch had gotten up and taken the stand, yes, maybe, but he never took the stand. The central theme, though, is, and you understand this, is that the defense wanted, their defense was that Hirsch, this was a concoction of Hirsch's all along. That's what they wanted to put the testimony on for. It was relevant to that theory. It wasn't relevant to the theory that it was offered at the time about how it had impacted on Ms. Lawrence. That has nothing whatsoever to do with Ms. Lawrence's testimony. And what Mr. Lambrose just stood up here and told this court was, he wants you to make the jump that because he twisted the arms of the kids, he necessarily twisted the arms of the arm of the barmaid. And it doesn't follow. As I said, I understand your nexus argument. I understand, I don't understand how it's cumulative and I don't understand why they weren't allowed to put it on you to make the argument that you just made here today, that obviously one doesn't have anything to do with the other. The theory at the time was that Lawrence's testimony was not relevant to Ms. Lawrence's testimony. Testimony was suspect because it's part of Hirsch's plot. Yeah, exactly. It doesn't, there are alternative arguments both negating or both affirming the judge's decision to exclude the testimony. It doesn't tend to show that Hirsch committed the crime. It doesn't impeach Lawrence. It doesn't impeach Hirsch because Hirsch hasn't testified. So, it's not admissible. It's not relevant. It's collateral, at best. I understand your argument. Why don't you turn to the Miranda issues before you run out of time. The Miranda issue, the allegations in the Federal Habeas Petition are he was in custody because the police did not tell him that he was free to leave. Well, there just simply isn't any case law, Supreme Court case law that says that the police have to tell somebody, oh, you're free to leave and that necessarily results in a determination that he's either in or not in custody. The allegations based on what was presented and what I supplied to the court in my excerpts of the record are the testimony with respect to the officers who were there, the testimony with respect to the taking of the deposition. He went with Sergeant Shaw to the police department. Was that done voluntarily by the defendant? Yes. Was he under arrest at the time? No. It's a matter of routine procedure. They took the formal statement. Had you indicated in any way to him that prior to the time of the formal statement that he was going to be arrested? No. Was he restrained in any way? No, sir. He read it. Did he freely and voluntarily sign each page of the statement? Yes, he did. At what point was he handcuffed? Can you tell me? From the record, it was clearly after he had made the statement. But before he signed it? No, I don't think. It appears to me from my review of the record, it was after he had signed everything. And where is that to be found in the record? Do you know? I direct the Court's attention to Respondent's Excerpt of the Record 107, where the Court is addressing counsel and asking, you know, okay, let me ask you this. Can we agree that the facts are that the defendant was taken to the police department, he was a suspect in the case, that he made an oral statement, that after he made the oral statement he was then placed in restraints and was handcuffed, and later the handcuffs had to be removed for him to sign the written statement? So he was handcuffed after he made the statement? If I may, Your Honor, please. Is that the factual basis of what happened? The prosecutor says, Your Honor, the State does not agree to the timing in which the restraints were placed on him. The Court, but in the light most favorable to the defendant, the restraints were not placed on him until after he made the oral statement. Who said that? That's the judge. At page 107 of Respondent's Excerpt of the Record down at line... But do we have any testimony, do you know, in this record? I haven't seen it. Well, you have defense counsel saying after that, I believe that's accurate, Your Honor. Don't we have a finding of fact in the Supplemental Excerpt of Record that Deering had to remove the restraints in order to sign the statement? Supplemental Excerpt of Record at 29. The Supplemental Excerpt of Record, Your Honor? My notes show... Well, I'm sorry. I beg your pardon, Your Honor. I apologize. I was referring to the page in the transcript. It is at page 29, Your Honor. It is at page 29 of the Excerpt of the Record. I apologize for... Yeah. Isn't there a finding of fact in there that he had to remove the restraints in order to sign the statement? Well, that's what I was pointing out to the judge, is that the judge, the Court, was asking, can we agree on these facts? Mr. Harmon said, I disagree as to the timing when the restraints were put on the Court, but in the light most favorable to the defendant, the restraints were not placed on him until after he made the oral statement. Is that correct? Mr. Martin, Mr. Deering's counsel says, I believe that's accurate, Your Honor, and the Court, but in the light most favorable to him, although you may disagree with him, and then he was later subsequently released from custody. He was not formally arrested until what a year or two later, and they go on. And then the Court, again, on page 30 of the Excerpt of the Record, talks about the ruling based on the party's agreement on the facts. And based on it, therefore, Your Honor, based on what was presented to the State District Court, there isn't anything that is erroneous, either as a matter of fact or contrary to the statute. And so I think that's correct, Your Honor. Anything further you want? There are some other issues in the case, but I think unless you have any questions, I'd be happy to answer them. Okay. Any further questions? No. Thank you, counsel. Thank you, Your Honor. We'll give you two minutes for rebuttal. Again, just so we're clear, the rule is that Mr. Deering has a constitutional right to present his theory of defense evidence so long as it's relevant to a material trial issue. The material trial issue was, was the bartender's confession true or false? Was it perjury or was it not perjury? So that was a material trial issue presented by the prosecutor. It wasn't a defense issue injected into the trial. Before the prosecutor rested, that became the issue. The proffer that Deering's lawyer made, and I quote from Excerpts of Record, page 68, and a part of our theory of the case and important part of it, although not all of it, as I said to Your Honor earlier in Chambers, is that Mrs. Lawrence, the bartender, and Mr. Hirsch got together in a very real sense, planned and agreed to do whatever they had to do to make sure that Deering wound up in prison. And then I go further on down at the end at line 21. Hirsch had a very real part in causing Mathis to submit what we argue, Your Honor, is a false statement and affidavit. The children's testimony does seem pretty collateral to that, though. I mean, just a threat made on one occasion. The key to the state's case is you have to believe the confession that was made to Deering. Okay? Now, that should not be presumptively believable. It wasn't presumptively believable to Detective Dillard until he got there and looked both Hirsch and Lawrence in the eye. Good police don't believe anything one way or another until they can establish it. That doesn't get you very far. I agree, but a good police officer then told the jury that he believed she was telling the truth, that that was fine. Why should that go unrebutted? Let me ask you another question about these children. The court, you know this. You've read it as well as I have. The court said, but to bring two children in now and say that they lied several years ago, how old are the children now, 10 and 12 years old? And when the incident happened, they went to the police station and they were 5 and 6? The witness said 5 and 6. All right, so they were 5 years old and 7 years old when they made these statements to the police. The police officer testified he went to the scene. They described trees and grass and it was concrete, so they made a determination they weren't going to prosecute. So I think that evidences in. But to have a 12-year-old and 10-year-old child come in now and say when they were 5 and 6, they lied, I think that would simply confuse the jury, be misleading, a waste of time and cumulative. Isn't that a factor? I mean, a 5 and a 6-year-old kid's got to come in when the kids are 10 and 12 and try to testify about something that happened when they were that young? The court seemed to be concerned about that. Well, Deering shouldn't be penalized for the fact that this quote-unquote confession that occurred in 83 was not given to the police until 1988. That's not an answer, counsel, and you know it. I'm asking you about the difference between a 5-year-old child and a 10- and a 12-year-old child. Well, that's a question of fact for the jury, Judge. I think that the jury should have been able to make an argument. Here it was a consideration that the court entered into in terms of whether this testimony would be useful in the case. But that's where the court's gatekeeping function became unconstitutional. And to get back to Judge Thomas's question, because I think they tie in, the reason that the children's evidence was not extrinsic, was not collateral to the main trial issue, was because the children's testimony was the only evidence that went to show demonstrably that Mr. Hirsch would do anything, including threaten his own children's lives and lie in order to suborn perjury. Nobody heard that. And that, the reason it goes out of the collateral ballpark and into a material substantive evidence-based evidence-based category, is because what was it offered for? It was offered to show that the bartender had a motive to lie. And that's what the evidence was presented for. You argued in your briefs, as I understand it, that because he was a former police officer then, he knew that he was in custody when they took him to the station. I don't think I made that argument. I think the argument was that he, I think I used the word voluntary, and that might not have been the most artful way of characterizing what happened. And I don't recall, I'm not saying I didn't, but I don't recall using that argument. And the voluntariness of it, if you will, was that during, quite frankly, by the time that he had been chaperoned, he thought that he, you know, from going from one house to the next house to make the telephone call and then into the cruiser and down to the station house, there was no voluntariness whatsoever. He thought that what he was doing was ending up having to go give information that he had to give, that he had no choice and that he was not free to leave. Well, he was a former police officer. Are we supposed to ignore that fact? I mean, we're supposed to believe that he didn't understand his Miranda rights? I'm just asking you to conduct the necessary objective test. Unless the Court has any other questions, that's all I have. Thank you for your argument.
judges: Ferguson, Trott, Thomas